FILED

2014 NOV -6 PM 4:04

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AUDATEX NORTH AMERICA, INC., <br><br> Plaintiff, <br><br> vs. <br><br> MITCHELL INTERNATIONAL, INC., <br><br> Defendant. | CASE NO. 13-cv-1523-BEN (BLM) <br><br> **CLAIM CONSTRUCTION ORDER** |

In this patent infringement action, the Parties sought construction of nine claim terms found in U.S. Patent Nos. 7,912,740; 8,200,513; and 8,468,038. This matter was heard on October 16, 2014. Having considered the briefs filed by the parties and the oral argument, the Court construes the disputed terms as follows.

## BACKGROUND

Plaintiff Audatex North America, Inc. ("Audatex") alleges that Defendant Mitchell International, Inc. ("Mitchell") willfully infringed, and continues to willfully infringe, U.S. Patent Nos. 7,912,740 ("the '740 Patent"), 8,200,513 ("the '513 Patent"), and 8,468,038 ("the '038 Patent") (collectively, the "patents-in-suit"). (Supplemented Am. Compl. ¶¶ 19, 31, 44). The '513 and the '038 Patents are continuations of the '740 Patent (*id.* at ¶¶ 24, 37), all of which are entitled, "System and Method for Processing Work Products for Vehicles Via the World Wide Web." (*Id.* at ¶¶ 9, 20, 33).

Audatex and Mitchell are competitors in the insurance estimation and loss valuation industry. (*Id.* at ¶ 6). Audatex alleges that Mitchell's "WorkCenter" software infringes on the patents-in-suit. (*Id.* at ¶¶ 13-44). Both Parties market and sell their products to customers, including insurance companies and collision repair facilities. (*Id.* at ¶ 6).

The patents-in-suit cover a system or method that determines the value of vehicles in connection with vehicle insurance claims. (Pl. Opening Br., Ex. A at 10, col. 1:55-57 [hereinafter '740 Patent]). The patented system allows customers to access a particular website and input vehicle insurance claim information. (*Id.* at col. 2:10-16). After doing so, the data is processed into a report that indicates the value of the vehicle, which is the subject of the insurance claim. (*Id.*)

## DISCUSSION

### I. LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted). Courts determine the meaning of disputed claim terms from the perspective of a person of ordinary skill in the art at the time the patent is filed. *Chamberlain Group, Inc. v. Lear Corp.*, 516 F.3d 1331, 1335 (Fed. Cir. 2008). Claim terms "are generally given their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312 (internal quotation marks omitted).

When construing claim terms, the court should first look to sources in the intrinsic record. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). First, "the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. Second, the claims "must be read in view of the specification, of which they are a part." *Id.* at 1315 (internal quotation marks omitted). The specification is usually "dispositive," as "it is the single best guide to the meaning of a disputed term." *Id.* (internal quotation

marks omitted). Third, courts should consider the patent's prosecution history, which is the record of proceedings before the Patent and Trademark Office ("PTO") and includes the prior art cited during the patent examination. *Id.* at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

If the intrinsic evidence resolves the ambiguity in the disputed claim terms, then "it is improper to rely on extrinsic evidence." *Vitronics*, 90 F.3d at 1583. If ambiguities in the claim terms remain, however, courts may consider extrinsic evidence. *Id.* at 1584. Extrinsic evidence includes expert testimony, inventor testimony, dictionaries, and scientific treatises. *Phillips*, 415 F.3d at 1317.

## II. THE '740, '513, AND '038 PATENTS

The Parties dispute nine claim terms found in the patents-in-suit.

### A. "Insurance Claim"

Audatex proposes that "insurance claim" be construed as "request to recover market value or repair costs in association with an insurance policy." (Pl. Opening Br. 12). Mitchell proposes a construction of "request for payment in association with an insurance policy." (Def. Opening Br. 4).

The Parties agree that "insurance claim" consists of a request in association with an insurance policy. (Pl. Opening Br. 12; Def. Opening Br. 4). Thus, the real dispute here is what kind of payment the insurance claim requests.

In numerous instances where the term "insurance claim" is used in the patents, the term is written in conjunction with "a damaged vehicle." (*E.g.*, '740 Patent at 11, col. 4:29-42) ("[T]he web site provides a plurality of web pages that allow an operator to input data relating to an insurance claim for a damaged vehicle."). In the remaining instances, the term still refers to a damaged vehicle. Also, the specification provides the context for which an insurance claim might be

used in relation to the patent. It states:

> When a vehicle such as an automobile is damaged the owner may file a claim with an insurance carrier. A claims adjuster typically inspects the vehicle to determine the amount of damage and the costs required to repair the automobile. If the repair costs exceed the value of the automobile, or a percentage of the car value, the adjuster may "total" the vehicle. The owner may then receive a check equal to the value of the automobile.

('740 Patent at 10, col. 1:13-20). Here, the need for an insurance claim is spurred by the damage to an insured's vehicle. The specification does not suggest any other need for an insurance claim. Any request for payment, therefore, would be related to repairing or replacing the vehicle.

Mitchell argues that "insurance claim" means any payment requested in association with an insurance claim. Mitchell supports its construction with a definition of "claim" from the *American Heritage College Dictionary*. (Def. Opening Br. 4). However, Mitchell's proposed construction is too broad. For example, Audatex points out that "a demand for payment of an insurance premium" would qualify as an insurance claim under Mitchell's construction, but a premium payment makes no sense in relation to the patents-in-suit. (Pl. Reply Br. 4). Further, it is unnecessary to use extrinsic evidence to construe this term, because the specification itself provides the appropriate meaning.

This Court therefore construes "insurance claim" as a "request to recover market value or repair costs in association with an insurance policy."

### B. "Market Value for the Damaged Vehicle"

Audatex proposes that "market value for the damaged vehicle" be construed as "value of the vehicle that was damaged, based on factors including mileage, condition, and geographic location." Mitchell proposes a construction of "current market value of the car that was damaged, adjusted based on mileage, condition of vehicle, and other factors."

The main dispute over this term is when the market value of the vehicle should be calculated. Mitchell argues that the market value should be taken after

the vehicle is damaged. (Def. Opening Br. 5). Audatex argues that the market value should should be taken immediately before it was damaged. (Pl. Reply Br. 1).

Mitchell's primary argument is that the specification states, "market value for the *damaged* vehicle," thus, the market value should include the damage done. (Def. Opening Br. 6 (emphasis added)). Mitchell further insists that if the term meant market value of the vehicle immediately before it was damaged, the patentee would have phrased the term that way. (Def. Opening Br. 6-7). Mitchell asserts that its construction is further supported by extrinsic dictionary definitions of "market value." (Def. Opening Br. 6).

The meaning of this term is derived from the specification, which describes the industry, and the use for a market value of vehicles. The specification provides the scenario where the market value of a vehicle is needed. First, the vehicle is damaged and the insurance company must determine the cost to repair the vehicle. ('740 Patent at 10, col. 1:13-20). The insurance company then compares the cost of repair to the value of the vehicle before it was damaged. Where the cost to repair exceeds the value of the vehicle (or a specified percentage thereof), the insurance company pays the insured the value of the vehicle, taken immediately before the accident occurred. (*Id.*) Two options result, either the insured receives his vehicle back, fully repaired and good-as-new; or he receives a check for an amount that would allow him to buy a vehicle of the same make, model, and year. Both scenarios intend to return the insured to the position he was in before the accident. Thus, the appropriate market value accounts for the value of the vehicle immediately before the accident.

Mitchell's argument is contrary to a reasonable understanding of the insurance estimation and valuation industry. The Court therefore construes "market value of the damaged vehicle" to mean "value of the vehicle that was damaged, based on factors including mileage, condition, and geographic location."

///

### C. "Valuation Server"

Audatex proposes that "valuation server" be construed as "computer in a network providing data used to generate a valuation report." (Pl. Opening Br. 11). Mitchell proposes a construction of "computer in a network where the insurance claim data, which is entered on each web page by an operator, is processed to generate a valuation report." (Def. Opening Br. 7).

The Parties' constructions differ when defining who or what provides the data used for the valuation report. Audatex's construction suggests the "computer in a network" provides the necessary information, while Mitchell suggests the information is provided by an operator. Based on the relevant claims and specification, this Court adopts Mitchell's proposed construction.

Claims 10 and 11 explain that the valuation server is coupled with a web server, which allows for the receipt of data that the valuation server uses to process a report. ('740 Patent at 11, col. 4:62-5:12). There is no indication that the valuation server provides anything but the valuation report. This means that the data the valuation server uses to process the report must be provided by something or someone else. The specification states, "Each web page allows an operator to enter the insurance claim data. The data can be processed into a valuation report by a separate valuation server." (*Id.* at 10, col. 2:13-16).

Audatex objects to Mitchell's construction because it "introduces a variety of confusing and irrelevant detail." (Pl. Opening Br. 11). However, Audatex provides no support for its construction that the valuation server "provides" data. Such a construction would be contrary to the specification. In fact, the sections of the specification that Audatex does cite support the Court's conclusion. (*See* Pl. Opening Br. at 11).

The Court therefore construes "valuation server" to mean "computer in a network where the insurance claim data, which is entered on each web page by an operator, is processed to generate a valuation report."

### D. "Valuation Report"

Audatex proposes that "valuation report" be construed as "a report that provides a market value for the damaged vehicle." (Pl. Opening Br. 9). Mitchell proposes a construction of "human-readable summary, generated by the valuation server, displaying the market value for the damaged vehicle in a value field." (Def. Opening Br. 9).

The Parties agree the valuation report provides or displays a market value for the damaged vehicle. The dispute here consists of the form of the report. Mitchell primarily argues the report should be limited to a "human-readable" format. Mitchell supports its construction by pointing to Figure 12 of the specification, which depicts a valuation report, and looks to an extrinsic dictionary for further support. (Def. Opening Br. 10).

Audatex argues the construction of "valuation report" should define what the report entails rather than its form. Claim 1 supports Audatex's construction, stating, "the valuation report provides a market value for the damaged vehicle." ('740 Patent at 11, col. 4:39-40). The specification weakens Mitchell's construction by stating, "FIG. 12 is an illustration of a valuation report." (*Id.* at 10, col. 2:3). In other words, although Figure 12 is human-readable, it is only one example of a valuation report— there could be other forms. It goes on, "The valuation report provides an adjusted market value for the vehicle in a value field. . . ." (*Id.* at 11, col. 4:7-9). Thus, to the patents-in-suit, it is what the valuation report entails that is important, not the format of the report as Mitchell suggests.

Mitchell also argues that "valuation report" should include "generated by the valuation server." The patents are clear, the valuation server generates the valuation report. (*See, e.g., id.* at 12, col. 5:9-12). Thus, the Court declines to add this phrase to the construction because it is superfluous.

The Court therefore construes "valuation report" to mean "a report that provides a market value for the damaged vehicle."

### E. "Transmitting/Transmission/Transmitted"

Audatex argues that no construction is required for "transmitting," "transmission," or "transmitted." (Pl. Opening Br. 14). In the alternative, Audatex argues the term should be construed as "sending/sent." (*Id.*) Mitchell proposes that this term be construed as "transfer of data via email over a network using the email address(es) listed in the destination filed that have been filled in by the operator." (Def. Opening Br. 12). The Court finds that no construction is required.

Mitchell argues that "transmit" should be construed "specifically with reference to the only way of sending the valuation report." (Def. Opening Br. 12). It takes this stance because "e-mailing of a valuation report is the only form of transmission disclosed or referred to in the specification." (Def. Opening Br. 12). This argument is not compelling.

Throughout the three patents-in-suit, the word "transmit," or some variation thereof, is written approximately 50 times. In only two instances are the terms used in conjunction with "email." Additionally, the specification mentions "transmitting a uniform resource locator," ('740 Patent at 11, col. 4:31); that "communication may be transmitted through the network . . . in TCP/IP format," (*id.* at 10, col. 2:28-29); and that the valuation report may be "transmitted to a client computer . . . through the web server . . . ." (*Id.* at col. 2:16-17). Mitchell's proposed construction of the "transmit" terms is inconsistent with the various uses of the term in the patents.

The Court therefore finds that no construction is required for "transmit," "transmitted," and "transmission."

### F. "Storage Medium/Computer Storage Medium/Computer Readable Storage Medium"

Audatex argues no construction is required for "storage medium," "computer storage medium," or "computer readable storage medium." (Pl. Opening Br. 22). Mitchell proposes the terms be construed to mean "physical material on which data bits are written and stored, such as floppy disks, hard disks, tape, and optical disks."

1  (Def. Opening Br. 13).
2      The specification explicitly states, "Without limiting the scope of the
3  invention the term computer readable medium may include the memory device . . .
4  and/or the mass storage device. . . . [C]omputer readable medium may also include
5  a diskette, a compact disc, an integrated circuit, a cartridge, or even a remote
6  communication of the software program." ('740 Patent at 10, col. 2:63-3:4).
7  Mitchell's construction may be consistent with the examples listed in the
8  specification, but Mitchell fails to realize what was written just a few lines above,
9  that the patents-in-suit are not limited to those examples.
10     The Court therefore finds that no construction is required for "storage
11 medium," "computer storage medium," and "computer readable storage medium."

12     **G. "Receive Data/Receipt of Data/Receiving Data"**

13     Audatex argues that no construction is required for the terms "receive data,"
14 "receipt of data," and "receiving data." (Pl. Opening Br. 17). Alternatively,
15 Audatex proposes the terms be construed as "accept data," "acceptance of data,"
16 "accepting data." (*Id.*) Mitchell proposes the terms be construed as "accepting and
17 storing data input on the client computer to the valuation server." (Def. Opening
18 Br. 14).

19     Mitchell argues this term requires a unique, specific definition. Mitchell's
20 construction does not clarify the word "data," it only defines "receive." To be clear,
21 Mitchell asks this Court to construe the word "receive" one way when it is used in
22 conjunction with "data," and another way when it is combined with other words.
23 Mitchell attempts to support its construction by showing that the valuation server
24 and the client computer are the only places identified in the specification to use
25 data. (Def. Opening Br. 15; Def. Reply Br. 8).

26     The Court is not convinced by Mitchell's construction. First, variations of
27 "receive" are used in conjunction with: "a check" ('740 Patent at 10, col. 1:19); "in
28 TCP/IP format" (*id.* at col. 2:58); "a previous claim" (*id.* at 11, col. 3:49); and "the

valuation report" (*id.* at col. 5:7-8). Second, the term "receipt" does not necessarily imply "storage," and Mitchell provides no support that it does. No sufficient reason has been presented to support a construction of the "receive data" terms.

The Court therefore finds no construction is required for the terms "receive data," "receiving data," and "receipt of data."

### H. "Electronic Communication Network"

Audatex argues that no construction is required for the term "electronic communication network." (Pl. Opening Br. 21). Mitchell proposes the term be construed as "a wide area network such as the internet." (Def. Opening Br. 17).

Mitchell attempts to support its construction by quoting the specification and citing to extrinsic evidence. (*See* Def. Opening Br. 18 ("[A]n electronic communication network such as the internet.")). However, the language of the specification is not as definitive as Mitchell would like it to be. It indicates only an example of an electronic communication network, not an intention to limit the term to one type of network. Thus, Mitchell's proposed construction is inconsistent with the language of the patents-in-suit.

Audatex argues no construction is required because this term is "facially clear." (Pl. Opening Br. 21). It also quotes the specification, showing another example of its less-than-conclusive language. (*See* Pl. Opening Br. 21 ("The electronic communication network may be a wide area network (WAN) such as the internet.")). Further, the patent claims use the term without referencing any specific type of network—suggesting an intention to prevent limitation. *See Kara Technology, Inc. v. Stamps.com, Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The claims, not the specification embodiments, define the scope of patent protection.").

The Court therefore finds that no construction is required for "electronic communication network."

///
///

### I. "Web Site"

Audatex again argues that no construction is required for the term "web site." (Pl. Opening Br. 19). Alternatively, Audatex proposes the term be construed as "one or more related web pages." (*Id.*) Mitchell proposes a construction of "group of related HTML documents and associated files, scripts, and databases that is served up by an HTTP server and accessible via a specific uniform resource locator." (Def. Opening Br. 19).

Mitchell argues its construction is consistent with the understanding of a person of ordinary skill in the art because its construction comes virtually verbatim from a technical dictionary published at the time of filing. (Def. Reply Br. 10). Audatex argues no construction is required because anyone would know what "web site" means. (Pl. Opening Br. 19).

This Court is not convinced that a definition is required this term. "Web site" is such a common term that it seems apparent that even a lay person would understand what "web site" means. *See Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."). The Court therefore finds that no construction is required for the term "web site."

## CONCLUSION

For the reasons stated above, the Court construes the disputed terms as follows:

| Term | Court's Construction |
|---|---|
| Insurance claim | request to recover market value or repair costs in association with an insurance policy |
| Market value for the damaged vehicle | value of the vehicle that was damaged, based on factors including mileage, condition, and geographic location |

| | |
|---|---|
| Valuation server | computer in a network where the insurance claim data, which is entered on each web page by an operator, is processed to generate a valuation report |
| Valuation report | a report that provides a market value for the damaged vehicle |
| Transmitting/transmission/transmitted | Does not require construction |
| Storage medium/computer storage medium/computer readable storage medium | Does not require construction |
| Receive data/receipt of data/receiving data | Does not require construction |
| Electronic communication network | Does not require construction |
| Web site | Does not require construction |

**IT IS SO ORDERED.**

Dated: November 6, 2014

HON. ROGER T. BENITEZ
United States District Judge